UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NICK DI VINCENZO, Derivatively on Behalf of AVID TECHNOLOGY, INC., ) ) | Case No. |
| Plaintiff, ) | |
| v. ) | |
| GARY G. GREENFIELD, KENNETH A. SEXTON, LOUIS HERNANDEZ, JR., GEORGE H. BILLINGS, NANCY HAWTHORNE, ELIZABETH M. DALEY, YOUNGME E. MOON, JOHN H. PARK, DAVID B. MULLEN, and ROBERT M. BAKISH, ) ) ) ) ) ) ) | |
| Defendants, ) | |
| -and- ) | |
| AVID TECHNOLOGY, INC., a Delaware corporation, ) ) | |
| Nominal Defendant. ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Avid Technology, Inc. ("Avid" or the "Company") against the members of its Board of Directors (the "Board") and certain current and former executives at the Company (collectively, the "Individual Defendants").  This action seeks to remedy the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

2.      Avid develops, markets, sells, and supports a variety of software and systems for creating and manipulating digital media content.  The Company's products are generally used for creating and manipulating digital audio and video.  Much of the Company's software is sold with a promise of free bug fixes, upgrades, enhancements, and compatibility extensions (collectively "Software Updates").  Under Generally Accepted Accounting Principles ("GAAP"),[1] when a company provides such no-charge future services in connection with the sale of a product, the company cannot recognize the full revenue from the sale until all post-contract customer support ("PCS") has been fulfilled.  Rather, the revenue recognition must be recorded ratably over the estimated time period that the Company expects to provide the PCS services.

3.      This basic tenant of accounting is well known by the Individual Defendants. Indeed, each and every Annual Report on Form 10-K filed with the SEC and signed by the Board

---

[1] Financial statements filed with the U.S. Securities and Exchange Commission ("SEC") are required to be in accordance with GAAP and are the responsibility of the Company.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

since at least 2007 has stated that the Company defers the fair value all products that are provided to customers with a no-charge support period, and that the Company recognizes the related revenue ratably over the span of the service period. These statements were incorrect. In truth, since at least 2010, Avid has ignored GAAP requirements and its own internal policies by repeatedly, prematurely recognizing revenue for certain no-cost services that were not yet provided to its customers. Further, the Individual Defendants have repeatedly and incorrectly touted inflated revenues and expected revenue growth based on the Company's improper, premature revenue recognition.

4.     On February 25, 2013, the Company first disclosed that there might be issues with its revenue recognition policies. In particular, Avid disclosed that the Company was unable to timely report its financial results for the fourth quarter of 2012 because it needed additional time "to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products which the Company has provided to certain customers." On this news, the Company's market capitalization fell from more than $298.1 million to $271.7 million, a loss of almost $26.5 million, or nearly 9%.

5.     Less than a month later, on March 19, 2013, Avid revealed that the primary focus of its ongoing review of the Company's accounting treatment of Software Updates was to determine whether no-charge bug fixes, upgrades, or enhancements should have been accounted for as PCS under GAAP, and whether the revenue should have been recorded ratably as per the Company's own stated policies. The Company further disclosed that if the no-charge services were improperly accounted for, Avid's historical revenue recognition for related sales "will likely" be inaccurate, and that the Company could not predict the materiality of any adjustments

that might be required.  As a result of the above, the Company stated that it could not timely file its 2012 annual financial report.

6.  On May 13, 2013, Avid admitted that, as its fiduciaries claimed it was doing in previous SEC filings, the Company should have been recognizing revenue for PCS-related sales ratably over the estimated PCS service period.  The Company further disclosed that it was continuing to evaluate the impact on the Company's financial statements, including with respect to **numerous individual transactions spanning over at least five years**, and therefore Avid was unable to timely file its first quarter financial report for 2013.

7.  Finally, on May 21, 2013, Avid was forced to admit that as a direct result of the Company's historical, improper revenue recognition practices, ***Avid's 2011 and 2012 quarterly financial statements and 2009-2011 annual financial statements may be inaccurate and should not be relied upon as a result of errors in the application of GAAP***.  The Company further admitted that ***all previously issued press releases or other publicly issued statements containing financial information for such periods also may be inaccurate should not be relied upon***.

8.  All told, the Company has paid dearly for the improper conduct of the Individual Defendants.  In total, the Individual Defendants' misconduct has wiped out more than $606.6 million in market capitalization, or 69%, from the Company's high of $878.3 million on February 17, 2011, a few months before the Company first announced that it had severely missed revenue targets.  This is on top of other costs, such as the amounts incurred in any investigation into the Company's revenue recognition policies and the restatement itself.

9.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least two federal securities class action lawsuits filed in this Court on behalf of

investors who purchased Avid's shares (the "Securities Class Actions").   In addition, in connection with the above disclosures, in April 2013, Avid received a document preservation request from the SEC and a federal grand jury subpoena from the U.S. Department of Justice ("DOJ").

## JURISDICTION AND VENUE

10.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff is not a citizen of the United States and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Avid maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of

fiduciary duties owed to Avid occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Nick Di Vincenzo was a shareholder of Avid at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Avid shareholder.  Plaintiff is a citizen of Canada.

**Nominal Defendant**

14.     Nominal Defendant Avid is a Delaware corporation with principal executive offices located at 75 Network Drive, Burlington, Massachusetts.  Accordingly, Avid is a citizen of Delaware and Massachusetts.  Avid is a leading provider of digital media content-creation products and solutions for audio, film, video, and broadcast professionals, as well as artists and creative enthusiasts.  Avid's customers use the Company's products to create various forms of media, including music and videos.  Avid provides digital media content-creation products and solutions to customers in three market segments: media enterprises, professionals and post, and creative enthusiasts.

**Defendants**

15.     Defendant Gary G. Greenfield ("Greenfield") was Avid's President, Chief Executive Officer ("CEO"), and Chairman of the Board from December 2007 to February 2013 and a director from December 2007 to May 2013.  Defendant Greenfield is also named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendant Greenfield knowingly,

recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.  Avid paid defendant Greenfield the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2011 | $936,000 | - | $3,507,525 | - | $398,248 | $13,154 | $4,854,927 |
| 2010 | $939,600 | $400,000 | $1,048,500 | $1,197,749 | $690,406 | $14,018 | $4,290,273 |

Defendant Greenfield is a citizen of Massachusetts.

16.     Defendant Kenneth A. Sexton ("Sexton") was Avid's Executive Vice President and Chief Administrative Officer from January 2008 to April 2013 and Chief Financial Officer ("CFO") from July 2008 to April 2013.  Defendant Sexton is also named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Sexton knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.   Avid paid defendant Sexton the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|-------------------------|-------|
| 2011 | $400,000 | - | $1,670,250 | - | $158,192 | $171,784 | $2,400,226 |
| 2010 | $401,539 | $75,000 | $349,500 | $532,575 | $268,872 | $171,517 | $1,799,003 |

Defendant Sexton is a citizen of Ohio.

17.     Defendant Louis Hernandez, Jr. ("Hernandez") is Avid's CEO and President and has been since February 2013 and a director and has been since February 2008.   Defendant Hernandez was also Avid's Lead Director from December 2011 to February 2013.   Defendant Hernandez knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.   Avid paid defendant Hernandez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|-------------|-------------------|---------------|------------------------------|-------|
| 2011 | $94,278 | $19,028 | $98,940 | $212,246 |
| 2010 | $95,000 | $41,968 | $29,360 | $166,328 |

Defendant Hernandez is a citizen of Connecticut.

18.     Defendant George H. Billings ("Billings") is Avid's Chairman of the Board and has been since February 2013 and a director and has been since March 2004.   Defendant Billings is also a member of Avid's Audit Committee and has been since at least March 2010 and was Chairman of that committee from at least March 2010 to at least March 2012.   Defendant Billings knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP

and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.   Avid paid defendant Billings the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $243,750 | $19,028 | $98,940 | $361,718 |
| 2010 | $153,000 | $41,968 | $29,360 | $224,328 |

Defendant Billings is a citizen of Florida.

19.     Defendant Nancy Hawthorne ("Hawthorne") is an Avid director and has been since October 1997.  Defendant Hawthorne is also a member of Avid's Audit Committee and has been since at least March 2012.  Defendant Hawthorne was Avid's Lead Director from January 2008 to December 2011 and interim CEO from August 2007 to December 2007.  Defendant Hawthorne knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.  Avid paid defendant Hawthorne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $252,723 | $19,028 | $98,940 | $370,691 |
| 2010 | $176,000 | $41,968 | $29,360 | $247,328 |

Defendant Hawthorne is a citizen of Massachusetts.

20.     Defendant Elizabeth M. Daley ("Daley") is an Avid director and has been since February 2005.  Defendant Daley is also a member of Avid's Audit Committee and has been

since at least March 2010. Defendant Daley knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases. Avid paid defendant Daley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $111,000 | $19,028 | $98,940 | $228,968 |
| 2010 | $100,500 | $41,968 | $29,360 | $171,828 |

Defendant Daley is a citizen of California.

21.     Defendant Youngme E. Moon ("Moon") is an Avid director and has been since September 2005. Defendant Moon knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases. Avid paid defendant Moon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $89,750 | $19,028 | $98,940 | $207,718 |
| 2010 | $80,000 | $41,968 | $29,360 | $151,328 |

Defendant Moon is a citizen of Massachusetts.

22.     Defendant John H. Park ("Park") is an Avid director and has been since March 2012 and from June 2007 to June 2011. Defendant Park knowingly or recklessly: (i) failed to

implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.  Defendant Park is a citizen of Utah.

23.     Defendant David B. Mullen ("Mullen") is an Avid director and has been since July 2009.  Defendant Mullen is also Chairman of Avid's Audit Committee and has been since at least June 2013 and a member of that committee and has been since at least March 2010. Defendant Mullen knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv) caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.  Avid paid defendant Mullen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $115,010 | $19,028 | $98,940 | $232,978 |
| 2010 | $100,500 | $41,968 | $29,360 | $171,828 |

Defendant Mullen is a citizen of Illinois.

24.     Defendant Robert M. Bakish ("Bakish") is an Avid director and has been since October 2009.  Defendant Bakish knowingly or recklessly: (i) failed to implement adequate internal and financial controls at Avid; (ii) failed to ensure the Company's financial statements were in accordance with GAAP and Avid's own publicly disclosed accounting procedures; (iii) made incorrect or misleading statements in various SEC filings and press releases; and (iv)

caused or allowed the Company to file various additional incorrect or misleading SEC filings and press releases.  Avid paid defendant Bakish the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Restricted Stock Unit Awards | Total |
|---|---|---|---|---|
| 2011 | $90,068 | $19,028 | $98,940 | $208,036 |
| 2010 | $92,000 | $41,968 | $29,360 | $163,328 |

Defendant Bakish is a citizen of New Jersey.

25.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15, 17-24 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18-20, 23 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶15-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Avid and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Avid in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Avid and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of Avid were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Avid were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Avid conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

28.     Each officer and director of the Company owes to Avid and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Breaches of Duties**

29.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Avid, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

30.      The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate without adequate internal and financial controls.  The Individual Defendants also breached their fiduciary duty of loyalty by allowing defendants to cause, or by themselves causing, the dissemination of SEC filings and public statements which they knew or were reckless in not knowing contained improper statements and omissions, including with respect to the Company's financial controls and business prospects.

31.      The Individual Defendants, because of their positions of control and authority as officers and/or directors of Avid, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Avid has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

32.      In addition to these duties, under its Charter in effect since at least 2005, the Audit Committee Defendants, defendants Billings, Daley, Hawthorne, and Mullen, owed specific duties to Avid to assist the Board in overseeing the Company's accounting and financial

reporting processes and the audits of the Company's financial statements.   Moreover the Audit

Committee's Charter provides in relevant part:

4. <u>Review of Audited Financial Statements</u>

(a) <u>Discussion of Audited Financial Statements</u>. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

(b) <u>Recommendation to Board Regarding Financial Statements</u>. The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

(c) <u>Audit Committee Report</u>. The Audit Committee shall prepare an annual committee report for inclusion where necessary in a proxy statement of the Company relating to an annual meeting of security holders at which directors are to be elected.

5. <u>Review of Other Financial Disclosures</u>

(a) <u>Independent Auditor Review of Interim Financial Statements</u>. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to the filing by the Company of such information on a Quarterly Report on Form 10-Q with the SEC and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to file interim financial information on a Quarterly Report on Form 10-Q with the SEC prior to completion of the independent auditor's review of interim financial information.

6. <u>Controls and Procedures</u>

(a) Oversight. The Audit Committee shall coordinate the Board of Director's oversight of the Company's internal accounting controls, disclosure controls and procedures, and Code of Business Conduct and Ethics. The Audit Committee shall receive and review the reports of the chief executive officer and chief financial officer required by Rule 13a-14 of the Securities Exchange Act of 1934, as amended.

33.     Despite these additional duties, defendants Billings, Daley, Hawthorne, and

Mullen wholly abdicated their responsibilities to the Company and its shareholders by: (i) causing or allowing the Company to issue incorrect statements; (ii) failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing incorrect statements; (iii) failing to ensure the Company's compliance with its own revenue recognition policies; and (iv) failing to ensure the Company's compliance with applicable laws and regulations, including GAAP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Avid, regarding the Individual Defendants' management of Avid's operations and the Company's business, financial performance, and prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Avid and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

36.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue incorrect financial statements.

37.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

38.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release incorrect statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## AVID'S GAAP VIOLATIONS

40.     Financial statements filed with the SEC are required to comply with GAAP. GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that ***financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading*** and inaccurate, despite footnote or other disclosure.

41.     GAAP requires a restatement to occur when the originally issued financial statements are based on improper or fraudulent accounting practices.  As set forth in the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") 250, the type of restatement made by Avid is for a "*correction of an error in previously issued financial statements*."  ASC 250-10-5-4 defines an error in previously issued financial statements as "*[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared*."

42.     SEC Staff Accounting Bulletin ("SAB") 114, *Introductory Material*, summarizes GAAP materiality standards.  Among other items, SAB 114 says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  *See* SAB 114, Topic 1, §M.1., *Financial Statements; Materiality – Assessing Materiality.*  Statement on Auditing Standards 99 also provides that intentional misstatements, even of immaterial items, may be illegal and constitute fraudulent financial reporting.  *See* SAB 114, Topic 1, §M.2., *Financial Statements; Materiality – Immaterial Misstatements That Are Intentional.*

43.     The Individual Defendants are responsible for Avid's violations of GAAP because they knowingly or recklessly employed improper accounting and disclosure practices that misstated the financial results and position of Avid.  In particular, the Individual Defendants failed to properly account for certain no-charge services that Avid provided various customers in connection with software sales.

44.     The Company was required to ratably record the software sales revenue over the estimated time period that the Company expected to provide the no-charge services.  Indeed, as detailed below, the Individual Defendants repeatedly stated that Avid deferred the fair value of

sales that included various no-cost services, upgrades, enhancements, or other maintenance.   In stark contrast, however, the Individual Defendants caused or allowed the Company to repeatedly frontload its financial statements by improperly recording the full sales revenues immediately upon completion of the software sales.

45.     Avid's financial misstatements were material.   GAAP explains that whether a misstatement is material is based on the following considerations:

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.

- Whether the misstatement changes a loss into income or vice-versa.

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

*See* SAB 114, Topic 1, §M.1.

46.     Avid's misstatements satisfy each of these criteria and thus, were material from both a quantitative and qualitative perspective.   Accordingly, the GAAP violations alleged herein are also material.

**THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS**

47.     Despite the above GAAP requirements and the Company's own publicly stated revenue recognition policies, since at least 2010, the Individual Defendants have either caused or permitted Avid to repeatedly, prematurely recognize revenue for no-cost services that were not yet provided to its customers.   Further, the Individual Defendants have repeatedly and incorrectly touted inflated revenues and expected revenue growth based on the Company's improper, premature revenue recognition.   As a result, as the Company was recently forced to admit, ***all of***

*the below quarterly and year-end financial statements and all of the below publicly issued statements containing financial information are likely inaccurate and "should no longer be relied upon because of these errors in the application of GAAP*."

48.     On January 28, 2010, Avid issued a press release announcing its fourth quarter and fiscal 2009 financial results for the period ended December 31, 2009.   Avid reported revenues for the quarter of $174.7 million and a GAAP net loss for the quarter of $17.9 million, or $0.48 per share.   For fiscal 2009, Avid reported revenues of $629 million and a GAAP loss of $68.4 million, or $1.83 per share.   With respect to the Company's revenues, defendant Greenfield stated that "Avid ha[d] made good progress this quarter[,]" that its "revenues were up sequentially and [that the Company] believe[d] [its] markets [were] stabilizing with some signs of recovery."

49.     On March 16, 2010, Avid filed its annual financial report on Form 10-K for the period ended December 31, 2009, with the SEC (the "2009 Form 10-K"). The 2009 Form 10-K, which included financial results similar to those above, was signed by defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, Park, and Sexton, and was certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Greenfield and Sexton.  The Form 10-K incorrectly stated that: (i) the Company's internal control over financial reporting was effective; (ii) the Company's financial statements were prepared in accordance with GAAP; and (iii) the Company ratably recognized the revenue associated with various no-cost services provided to its customers.   Defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, Park, and Sexton failed to disclose that certain of the Company's revenues were improperly frontloaded and based on premature revenue recognition in violation of GAAP and Avid's own policies.   These defendants also failed to

disclose that the Company lacked the appropriate internal controls to prevent such violations. In relevant part, the 2009 Form 10-K stated:

### Management's Report on Internal Control Over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Securities Exchange Act of 1934, as amended, as a process *designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2009. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on this assessment, *management has concluded that as of December 31, 2009 the Company's internal control over financial reporting is effective* based on the criteria set forth by the COSO.

\* \* \*

### *Revenue Recognition and Allowances for Product Returns and Exchanges*

\* \* \*

Technical support, enhancements and unspecified upgrades typically are provided at no additional charge during an initial warranty period (generally between 30 days and twelve months), which precedes commencement of any maintenance contracts. ***We defer the fair value of this support and recognize the related revenues ratably over the initial warranty period***. We also from time to time offer certain customers free upgrades or specified future products or enhancements. For each of these elements that is undelivered at the time of product shipment, and provided that we have vendor-specific objective evidence of fair value for the undelivered element, ***we defer the fair value of the specified upgrade, product or enhancement and recognize those revenues only upon later delivery or at the time at which the remaining contractual terms relating to the upgrade have been satisfied***.

50.     On April 22, 2010, Avid issued a press release announcing its first quarter 2010 financial results for the period ended March 31, 2010. The Company reported revenues of $156 million and a GAAP net loss for the quarter of $13.5 million, or $0.36 per share. Defendant Greenfield touted that Avid's "year-on-year first quarter revenue increase [was] a positive sign not only for the growth of Avid's business, but the industry-at-large." During Avid's earnings conference call held on the same day, defendant Sexton also boasted about the Company's year-on-year growth and first quarter 2010 financial results.

51.     On May 7, 2010, Avid filed its quarterly financial report on Form 10-Q with the SEC detailing financial results for the first quarter of 2010 similar to those disclosed in its April 22, 2010 press release. The Form 10-Q was signed by defendant Sexton, and was also certified as accurate by defendants Greenfield and Sexton pursuant to SOX. The Form 10-Q stated that Avid's CEO and CFO concluded that, as of March 31, 2010, the Company's disclosure controls and procedures were effective at a reasonable assurance level.

52.     On July 22, 2010, Avid issued a press release announcing its second quarter 2010 financial results for the period ended June 30, 2010.  The Company reported revenues of $162.2 million and a GAAP net loss for the quarter of $12.9 million, or $0.34 per share.  Defendant Greenfield reiterated that Avid was "encouraged with the year-over-year revenue growth and … optimistic about the second half as [it] continue[d] to track towards profitability."  During Avid's earnings conference call held the same day, defendants Greenfield and Sexton repeated the above financial results, and defendant Sexton expressed excitement that the Company had reported its highest growth rate since 2007.

53.     On August 6, 2010, Avid filed its quarterly financial report on Form 10-Q for the second quarter of 2010 with the SEC.  The Form 10-Q included detailed financial results similar to those in the July 22, 2010 press release. The Form 10-Q was signed by defendant Sexton, and was also certified as accurate by defendants Greenfield and Sexton pursuant to SOX.

54.     On October 21, 2010, Avid issued a press release announcing its third quarter 2010 financial results for the period ended September 30, 2010.  The Company reported revenues of $165.1 million and a GAAP net loss for the quarter of $10 million, or $0.26 per share.  Defendant Greenfield boasted that Avid was "pleased to report [its] strongest financial quarter since 2007 including a non-GAAP operating profit and strong year-over-year revenue growth."  Following the press release, during Avid's earnings conference call held on the same day, defendant Greenfield touted that "the third quarter results represent a key milestone in [Avid's] transformation."   Defendant Sexton added that Avid had experienced growth across the business and that the third quarter represented the Company's "highest year-on-year revenue growth since the third quarter of 2006."

55.     On November 4, 2010, Avid filed its quarterly financial report on Form 10-Q for the third quarter of 2010 with the SEC.  The Form 10-Q contained financial results similar to those above, and was signed by defendant Sexton.  Defendants Greenfield and Sexton certified the accuracy of the Form 10-Q pursuant to SOX.

56.     On February 4, 2011, Avid issued a press release announcing its fourth quarter and fiscal 2010 financial results.  Avid reported revenues of $195.3 million and a GAAP net loss for the quarter of only $571 thousand, or $0.01 per share.  Avid reported revenues for FY 2010 of $678.5 million and a GAAP loss of $37 million, or $0.98 per share.  With respect to the financial results, defendant Greenfield stated that Avid was "pleased to end 2010 on a positive note with year-on-year revenue growth for the quarter and for the year."  In Avid's follow-up earnings conference call held on the same day, defendant Greenfield further boasted that Avid had experienced the "highest level of quarterly growth in over four years" and was "close to breakeven net income on a GAAP basis for the quarter."

57.     On March 14, 2011, Avid filed its annual financial report on Form 10-K for the period ended December 31, 2010, with the SEC detailing financial results similar to those above (the "2010 Form 10-K").  The 2010 Form 10-K was signed by defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, Park, and Sexton, and was certified as accurate pursuant to SOX by defendants Greenfield and Sexton.  As with previous Forms 10-K, the 2010 Form 10-K incorrectly stated that: (i) the Company's internal control over financial reporting was effective; (ii) the Company's financial statements were prepared in accordance with GAAP; and (iii) the Company ratably recognized the revenue associated with various no-cost services provided to its customers.  Defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, Park, and Sexton failed to disclose that certain of the

Company's revenues were improperly frontloaded and based on premature revenue recognition in violation of GAAP and Avid's own policies.  In relevant part, the 2010 Form 10-K stated:

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Securities Exchange Act of 1934, as amended, as a process ***designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*** and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- ***provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles***, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2010. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on this assessment, ***management has concluded that as of December 31, 2010 the Company's internal control over financial reporting is effective*** based on the criteria set forth by the COSO.

\* \* \*

*Revenue Recognition and Allowances for Product Returns and Exchanges*

\* \* \*

Technical support, enhancements and unspecified upgrades typically are provided at no additional charge during an initial warranty period (generally between 30 days and twelve months), which precedes commencement of any maintenance contracts. ***We defer the fair value of this support and recognize the related revenues ratably over the initial warranty period***. We also from time to time offer certain customers free upgrades or specified future products or enhancements.   For each of these elements that is undelivered at the time of product shipment, and provided that we have vendor-specific objective evidence of fair value for the undelivered element, ***we defer the fair value of the specified upgrade, product or enhancement and recognize those revenues only upon later delivery or at the time at which the remaining contractual terms relating to the upgrade have been satisfied***.

58.     On April 21, 2011, Avid issued a press release announcing its first quarter 2011 financial results for the period ended March 31, 2011.   The Company reported revenues of $166.3 million and a GAAP net loss for the quarter of $5.1 million, or $0.13 per share. Defendant Greenfield stated that the Company was "building on the momentum [it] established throughout the past year," and that the "quarter represented the third consecutive quarter that [Avid] achieved a non-GAAP operating profit."   During Avid's earnings conference call held later that day, defendants Greenfield and Sexton reiterated the financial results and touted that they represented the fifth consecutive quarter of year-on-year revenue growth and the third consecutive quarter of positive non-GAAP operating earnings.

59.     On May 10, 2011, Avid filed its quarterly financial report on Form 10-Q for the first quarter of 2011 with the SEC detailing financial results similar to those above disclosed in the press release above. The Form 10-Q was signed by defendant Sexton, and was also certified as accurate by defendants Greenfield and Sexton pursuant to SOX.

60.     On July 21, 2011, Avid issued a press release announcing its second quarter 2011 financial results for the period ended June 30, 2011. Avid reported disappointing revenues of $161.3 million, far below revenues that the Individual Defendants led investors to expect.  The press release also revealed a GAAP net loss for the quarter of $11.9 million, or $0.31 per share. The press release failed to disclose that the decrease in revenue may have been caused in part by the Company's premature revenue recognition for previous periods, which dried up its revenue pools and resulted in an absence of ratable revenue available to be recognized for the quarter. Instead, defendant Greenfield stated that "[w]hile Q2 was difficult, [Avid] believe[d] [its] business [was] sound."  During Avid's follow-up earnings conference call that same day, defendant Greenfield further stated that "[t]he sequential decrease was mostly the result of revenue performance in Europe" as a result of "uncertainties in certain countries, as well as internal challenges which have led to a realignment of our sales team in Europe."

61.     Despite the Individual Defendants' attempts to quell investor fears, on this news, the Company's market capitalization plummeted 25%, from more than $705 million to $527.9 million, wiping out more than $177.1 million overnight.

62.     On August 9, 2011, Avid filed its quarterly financial report on Form 10-Q for the second quarter of 2011 with the SEC detailing financial results similar to those disclosed in the July 21, 2011 press release. The Form 10-Q was signed by defendant Sexton, and both defendants Greenfield and Sexton certified its accuracy pursuant to SOX.

63.     On October 27, 2011, Avid issued a press release announcing its third quarter 2011 financial results for the period ended September 30, 2011.  The Company reported revenues of $165 million and a GAAP net loss for the quarter of $8 million, or $0.21 per share. Defendant Greenfield stated that "[t]he third quarter results showed sequential improvement in

revenue and profit," and emphasized that Avid "continue[d] [its] sharp focus on providing [its] customers with the products and solutions that help[ed] them succeed." Defendant Greenfield went on to state that the Company had "taken actions which should accelerate improvement in [its] financial performance." Later that day, defendants Greenfield and Sexton noted in Avid's earnings conference call that the third quarter results reflected an improvement from the previous quarter.

64.     On November 10, 2011, Avid filed its quarterly financial report on Form 10-Q for the third quarter of 2011 with the SEC detailing financial results similar to those provided in the October 27, 2011 press release. The Form 10-Q was signed by defendant Sexton, and certified by both defendants Greenfield and Sexton as to its accuracy pursuant to SOX.

65.     On February 7, 2012, Avid issued a press release announcing its fourth quarter and fiscal 2011 financial results for the period ended December 31, 2011. The Company reported revenues of $185.3 million and GAAP net earnings for the quarter of $1.2 million, or $0.03 per share. The Company also reported fiscal 2011 revenues of $677.9 million and a GAAP loss of $23.8 million, or $0.62 per share. Defendant Greenfield expressed optimism for the Company, stating that Avid's "results for the fourth quarter were encouraging and reflect[ed] [its] continued efforts to streamline [its] operations and improve execution across the business." Defendant Greenfield also boasted that "[f]or the quarter, [Avid] reported positive GAAP net income for the first time since 2007, positive cash flow from operations and the highest gross margin as a percent of revenue since 2005." Defendant Greenfield went on to note that Avid had "implemented the restructuring [it] announced in October and expect[ed] to see additional benefit from these actions in 2012," and that it "continue[d] to identify and implement changes across the Company to help improve [its] operational performance and remain sharply focused

on improving profitability while driving revenue growth."   During Avid's earnings conference call later that day, defendants Greenfield and Sexton reiterated the Company's purportedly positive financial results.

66.     On February 29, 2012, Avid filed its annual financial report on Form 10-K for the period ended December 31, 2011, with the SEC which included financial results similar to those detailed in the February 7, 2012 press release (the "2011 Form 10-K").   The 2011 Form 10-K was signed by defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, and Sexton, and was certified as accurate pursuant to SOX by defendants Greenfield and Sexton.   Like previous Forms 10-K, the 2011 Form 10-K incorrectly assured Avid's shareholders that: (i) the Company's internal control over financial reporting was effective; (ii) the Company's financial statements were prepared in accordance with GAAP; and (iii) the Company ratably recognized the revenue associated with various no-cost services provided to its customers. Defendants Greenfield, Bakish, Billings, Daley, Hawthorne, Hernandez, Moon, Mullen, and Sexton failed to disclose that certain of the Company's revenues were improperly based on premature revenue recognition in violation of GAAP and Avid's own policies.   These defendants also failed to disclose that the Company lacked the appropriate internal controls to prevent such violations.   In relevant part, the 2011 Form 10-K stated:

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Securities Exchange Act of 1934, as amended, as a process *designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles* and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles,* and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2011. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on this assessment, *management has concluded that as of December 31, 2011 the Company's internal control over financial reporting is effective* based on the criteria set forth by the COSO.

\* \* \*

***Revenue Recognition and Allowances for Product Returns and Exchanges***

\* \* \*

From time to time, we offer certain customers free upgrades or specified future products or enhancements. For software products, if elements are undelivered at the time of product shipment and provided that we have VSOE of fair value for the undelivered elements, *we defer the fair value of the specified upgrade, product or enhancement and recognize those revenues only upon later delivery or at the time at which the remaining contractual terms relating to the elements have been satisfied*. If we cannot establish VSOE for each undelivered element, all revenue is deferred until all elements are delivered, we establish VSOE or the remaining contractual terms relating to the undelivered elements have been satisfied. For non-software products, if elements are undelivered at the time of

product shipment, *we defer the relative selling price of the specified upgrade, product or enhancement and recognize those revenues only upon later delivery or at the time at which the remaining contractual terms relating to the elements have been satisfied*.

67.     On April 11, 2012, Avid issued a press release announcing its preliminary first quarter 2012 financial results for the period ended March 31, 2012. Avid reported revenues of $152 million and a GAAP net loss for the quarter of $15 million.

68.     On April 26, 2012, Avid issued announced actual first quarter 2012 financial results for the period ended March 31, 2012, that were substantially similar to those announce on April 11, 2012.  Defendant Greenfield noted that "[w]hile revenues were down from last year primarily related to the creative enthusiast portion of [Avid's] business, [the Company saw] positive signs in the post and professional and [its] media enterprise markets as customers [sought] to become more competitive by moving to more seamless workflows."  Defendant Greenfield further emphasized that the Company's "balance sheet [was] solid, ending the quarter with $50 million of cash and [that Avid] remain[ed] committed to delivering sustained profitability."

69.     On May 10, 2012, Avid filed its quarterly financial report on Form 10-Q for the first quarter of 2012 with the SEC detailing financial results similar to those disclosed in the April 26, 2012 press release.  The Form 10-Q was signed by defendant Sexton, and also contained SOX certificates signed by defendants Greenfield and Sexton.

70.     On July 2, 2012, Avid filed a current report on Form 8-K with the SEC.  The Form 8-K disclosed that the Company would be forced to institute a reduction in force and related actions intended to improve operational efficiencies. The reduction in force impacted approximately 20% of the Company's employees. The Form 8-K further disclosed that effective immediately, Kirk E. Arnold would cease to serve as the Company's Executive Vice President

and Chief Operating Officer and that Jason G. Burke, the Company's Vice President of Finance and Principal Accounting Officer, would end his employment on August 10, 2012.

71.     On July 30, 2012, Avid issued a press release announcing its second quarter 2012 financial results for the period ended June 30, 2012.  The Company reported revenues of $157.4 million and a GAAP net loss for the quarter of $39 million, or $1.01 per share.  Defendant Greenfield stated that the Company's "results for the second quarter were encouraging with 5% year-on-year revenue growth for [its] ongoing business and a $10 million sequential increase in [its] cash balance."  In addition, defendant Greenfield boasted that "performance reinforced the strategic direction [Avid] took earlier [that] month and [that Defendants were] excited about [Avid's] prospects for the second half of the year."  During Avid's earnings conference call held on the same day, defendants Greenfield and Sexton reiterated the financial results disclosed earlier that day.

72.     On August 9, 2012, Avid filed its quarterly financial report on Form 10-Q for the second quarter of 2012 with the SEC providing financial results similar to those detailed in the July 30, 2012 press release. The Form 10-Q was signed by defendant Sexton, and included certificates signed by defendants Greenfield and Sexton certifying its accuracy pursuant to SOX.

73.     On October 29, 2012, Avid issued a press release announcing its third quarter 2012 financial results for the period ended September 30, 2012.  The Company reported revenues of $127.2 million and a GAAP net loss for the quarter of $17.4 million, or $0.45 per share. Defendant Greenfield boasted that the Company was on a "path to returning the business to sustained profitability."  During Avid's earnings conference call held later that day, defendant Greenfield further touted that the Company was "pleased with the sequential improvement in

[Avid's] gross margin as a percent of revenue," and that the Company's "balance sheet remains strong."

74.     On November 9, 2012, Avid filed its quarterly financial report on Form 10-Q for the third quarter of 2012 with the SEC detailing financial results similar to those disclosed in the October 29, 2012 press release.  The Form 10-Q was signed by defendant Sexton, and both defendants Greenfield and Sexton certified its accuracy pursuant to SOX.

75.     On February 11, 2013, Avid filed a current report on Form 8-K with the SEC announcing, without explanation, that defendant Greenfield resigned as Chairman of the Board, CEO and President of Avid.  The Form 8-K further disclosed that defendant Greenfield would remain on the Board, and that director defendant Hernandez had been appointed as Avid's new CEO and President effective immediately.

## THE TRUTH EMERGES

76.     The truth behind the Company's business prospects, inaccurate financial statements, and the Individual Defendants' wrongdoing began to emerge on February 25, 2013, when the Company postponed the release of its fourth quarter earnings.  On that day, the Company provided the first hint that it may have been improperly accounting for certain no-charge Software Updates.  In particular, the press release stated:

> Avid® (NASDAQ: AVID) today announced that it is postponing its fourth quarter 2012 earnings release and investor conference call, previously scheduled for Tuesday, February 26, 2013 to provide additional time for the Company to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements to certain products which the Company has provided to certain customers. The need to evaluate the accounting treatment arose during the Company's normal review of its financial results for the fourth quarter and full year 2012. The Company is working diligently to complete its evaluation, but is currently unable to estimate when the evaluation will be completed.

77.     On this news, Avid's market capitalization plunged more than 9%, on February 25, 2013, to close at $271.7 million compared to the previous trading day's closing of $298.1 million, erasing almost $26.5 million (nearly 9%) in market capitalization in a single trading day.

78.     On March 19, 2013, the Company filed a Form Notification of Late Filing on Form NT 10-K with the SEC.  The Form NT 10-K revealed that the primary focus of Avid's ongoing review of the Company's accounting treatment of Software Updates was to determine whether no-charge bug fixes, upgrades, or enhancements should have been accounted for as PCS under GAAP, and whether the revenue should have been recorded ratably as per the Company's own previously stated policies.  The Company further disclosed that if the no-charge bug fixes were improperly accounted for, Avid's historical revenue recognition for related sales would be inaccurate, and that the Company could not predict the materiality of any adjustments that might be required.  The Form NT 10-K stated in relevant part:

> As previously announced, during the course of the Company's normal review of its financial results for the fourth quarter and full year 2012, it was determined that the Company needed to evaluate its current and historical accounting treatment related to bug fixes, upgrades and enhancements (collectively, Software Updates). The primary focus of the Company's evaluation to date has been to determine whether no-charge bug fixes previously made available by the Company to its customers included upgrades or enhancements and if so, whether such upgrades or enhancements met the definition of post-contract customer support (PCS) under U.S. Generally Accepted Accounting Principles.
>
> Generally, the Company recognizes software and product revenue upon delivery to the customer, provided all other revenue recognition criteria are met. However, *if the Company concludes no-charge PCS was provided under certain customer arrangements and not properly accounted as including such, then the timing of revenue recognition for those customer arrangements will likely change from the historical presentation in the Company's financial statements*. The revenue recognition related to those customer arrangements may change whereby all or a portion of the revenue would be recognized ratably over the estimated PCS service period. *The timing of recognition of certain costs related to these customer arrangements may also be impacted, along with the timing of related income taxes.*

The Company is working diligently to complete the review, which, among others, ***requires the evaluation of numerous transactions and Software Updates***. The Company is currently unable to estimate the time needed to complete its evaluation, predict the materiality of any adjustments that could be required, and the impact, if any, on prior periods. Given the amount of work remaining, the Company is unable to file its annual report on Form 10-K for the year ended December 31, 2012 by the prescribed due date and does not believe that it will be in a position to file its Form 10-K for the fiscal year ended December 31, 2012 by April 2, 2013, the fifteenth calendar day after the prescribed due date, but will continue to work expeditiously to file as soon as practicable thereafter.

79.     On March 21, 2013, Avid filed a current report on Form 8-K with the SEC disclosing that the Company's stock was at risk of being delisted.  In particular the Form 8-K stated that Avid had been notified by the NASDAQ Listing Qualifications Department on March 19, 2013, that the Company was no longer in compliance with NASDAQ Marketplace Rule 5250(c)(1), which requires timely filing of periodic reports with the SEC, and that the Company's continued non-compliance could serve as a basis for the delisting of the Company's stock from the NASDAQ Global Select Market.

80.     On April 22, 2013, Avid filed a current report on Form 8-K with the SEC announcing, without explanation, that effective immediately, defendant Sexton would no longer serve as Avid's Executive Vice President, CFO and Chief Administrative Officer.

81.     On May 13, 2013, Avid filed a Notice of Late Filing on Form 12b-25 with the SEC announcing that the Company it could not timely file its quarterly financial report on Form 10-Q for the quarter ended March 31, 2013.  The Form 12b-25 admitted that certain of the no-charge software releases ***were improperly accounted for, potentially spanning a five year period***.  The Form 12b-25 also admitted that the timing of revenue recognition for those customer arrangements would likely change from the historical presentation in the Company's financial statements to being recognized ratably over the estimated service period.  More, the Company revealed that both the timing of recognition of certain costs and the timing of related

income taxes might be impacted.  In addition, Avid disclosed that in April 2013, the Company

received a document preservation request from the SEC and a federal grand jury subpoena from

the DOJ requesting certain documents, including documents related to certain of the Company's

disclosures, financial transactions, as well as its accounting practices and procedures relating to

Software Updates.  The Form 12b-25 stated in relevant part:

> As previously reported in the Form 12b-25 Notification of Late Filing of Annual Report on Form 10-K for the year ended December 31, 2012 ("2012 Form 10-K") and the Current Report on Form 8-K (the "March Form 8-K") filed by the Company with the Commission on March 21, 2013 (collectively, the "Prior Reports"), during the course of the Company's normal review of its financial results for the fourth quarter and full year 2012, it was determined that the Company needed to evaluate its current and historical accounting treatment related to bug fixes, upgrades, enhancements and compatibility extensions (collectively "Software Updates"). The first step in the Company's evaluation was to determine whether no-charge software releases previously made available by the Company to its customers included upgrades or enhancements and if so, whether such upgrades or enhancements met the definition of post-contract customer support (PCS) under U.S. Generally Accepted Accounting Principles. During the course of this evaluation, ***the Company has concluded that certain of these no-charge software releases should, in fact, have been accounted for as PCS***. As a result, ***the timing of revenue recognition for these customer arrangements will likely change from the historical presentation in the Company's financial statements to being recognized ratably over the estimated PCS service period***. In addition, ***the timing of recognition of certain costs related to these customer arrangements may also be impacted, along with the timing of related income taxes***. The Company continues to evaluate the impact of these possible changes on the Company's financial statements in the current and prior periods. This evaluation requires the review of ***a large number of individual transactions spanning over at least five years***. The Company is also reassessing the accounting for certain restructuring costs, including a possible overstatement of restructuring expenses related to lease obligations and other exit activities in the quarter ended September 30, 2012.

> As a result of the continuing work required to complete the evaluation, the Company has not yet completed and cannot file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2013 (the "First Quarter 2013 Form 10-Q") by the prescribed due date and does not believe that it will be in a position to file its First Quarter Form 10-Q by May 15, 2013, the fifth calendar day after the prescribed due date, but will continue to work expeditiously to file as soon as practicable thereafter.

Additionally, in April 2013, *the Company received a document preservation request from the Staff of the Securities Exchange Commission (SEC) and a federal grand jury subpoena from the Department of Justice (DOJ) requesting certain documents, including in particular documents related to Avid's disclosures in the Prior Reports and its financial transactions. The Company understands the SEC and DOJ inquiries relate to its accounting practices and procedures, including the accounting treatment related to the Software Updates*. The Company is cooperating fully with the authorities. The Company cannot predict or determine the timing or outcome of these inquiries, the cost of responding to the inquiries or the impact, if any, of the inquiries on the Company's financial position, results of operations or cash flows.

82.     Finally, on May 21, 2013, Avid filed a current report Form 8-K with the SEC. The Form 8-K admitted that *certain of the Company's financial statements filed between 2010 and 2012 may be inaccurate and should not be relied upon*, and that *all previously issued press releases or other publicly issued statements containing financial information for such periods also may be inaccurate should not be relied upon because of errors in the application of GAAP*.  In relevant part, the Form 8-K stated:

> On May 20, 2013, after evaluating management's initial assessment of the potential magnitude of the incorrect application of GAAP with respect to certain Software Updates, the Audit Committee of the Company's Board of Directors concluded, after discussions with the Company's management that *the Company's unaudited interim consolidated financial statements for the quarterly periods ended (i) September 30, 2012 and 2011, (ii) June 30, 2012 and 2011, and (iii) March 31, 2012 and 2011, as well as its audited consolidated financial statements for the years ended December 31, 2011, 2010 and 2009 should no longer be relied upon because of these errors in the application of GAAP*. The Company's Audit Committee discussed this matter with the Company's independent registered public accounting firm, Ernst & Young LLP. In addition, *any previously issued press release or other publicly issued statement by the Company containing financial information for such periods should not be relied upon*.

## REASONS THE STATEMENTS WERE IMPROPER

83.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     the Company had blatantly inadequate internal controls;

(b)     the Company was prematurely recording revenue that should have been recorded ratably, in violation of GAAP and the Company's own revenue recognition policies; and

(c)     as a result of the foregoing, the Individual Defendants' representations concerning the Company's accounting policies and business and growth prospects were improper, and Avid's financial statements were inaccurate and not in accordance with GAAP or the Company's own policies.

## DAMAGES TO AVID

84.     As a result of the Individual Defendants' improprieties, Avid disseminated improper, public statements concerning the Company's revenue, business prospects, and financial controls.  These improper statements have devastated Avid's credibility as reflected by the Company's more than $606.6 million, or 69%, market capitalization loss.

85.     Further, as a direct and proximate result of the Individual Defendants' actions, Avid has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from the Company's internal review of the accounting violations;

(b)     costs incurred from restating past financial statements;

(c)     costs incurred from responding to the DOJ subpoena;

(d)     costs incurred from defending and paying any settlement in the Securities Class Actions for violations of federal securities laws; and

(e)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Avid.

86.      Moreover, these actions have irreparably damaged Avid's corporate image and goodwill.  For at least the foreseeable future, Avid will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Avid's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87.      Plaintiff brings this action derivatively in the right and for the benefit of Avid to redress injuries suffered, and to be suffered, by Avid as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Avid is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

88.      Plaintiff will adequately and fairly represent the interests of Avid in enforcing and prosecuting its rights.

89.      Plaintiff was a shareholder of Avid at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Avid shareholder.

90.      The current Board of Avid consists of the following eight individuals: defendants Hernandez, Billings, Hawthorne, Daley, Moon, Park, Mullen, and Bakish.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

91.     The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of violations of applicable law, including knowingly and consciously presiding over the Company's violations of GAAP, as well as actively covering up this misconduct through participation in the materially improper statements.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law, including the rampant manipulation of the Company's financial statements.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.

92.     The length of time and the scope of the wrongdoing occurring at the Company concerning its improper accounting manipulation makes it implausible to suggest that the Board would not be aware of the wrongdoing if its members were fulfilling their fiduciary duties.  This is particularly true since the Board has repeatedly stated that the Company was required to ratably recognize revenue for sales that included future no-charge services.  The Board's tacit or express approval of the illegal actions occurring at the Company could not have been the result of a fully informed business decision taken with the requisite due care.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

93.     As alleged above, defendants Hernandez, Billings, Hawthorne, Daley, Moon, Park, Mullen, and Bakish breached their fiduciary duties of loyalty failing to implement adequate internal controls and by making improper statements in the Company's press releases and SEC filings.  Each of the above defendants signed the Company's 2009, 2010, and 2011 Forms 10-K,

which: (i) incorrectly stated that the Company's internal controls over financial reporting were effective; (ii) incorrectly stated that the Company's financial statements were prepared in accordance with GAAP; (iii) incorrectly stated that the Company ratably recognized the revenue associated with various no-cost services provided to its customers; and (iv) included financial information that the Company has admitted should not be relied upon.  These statements were improper because they knowingly or recklessly misstated and/or omitted material, adverse facts concerning the Company's financial performance and condition, as well as the effectiveness of Company's internal controls.  Indeed, the Company has admitted that these statements should no longer be relied upon.

94.     Further, as members of the Audit Committee during relevant times, defendants Billings, Daley, Hawthorne, and Mullen reviewed and approved the improper statements, earnings guidance, internal accounting controls, disclosure controls, and procedures.  The Audit Committee's Charter further provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, defendants Billings, Daley, Hawthorne, and Mullen were responsible for overseeing and directly participating in the Company's numerous accounting violations.  Despite their knowledge of the wrongdoing alleged herein, defendants Billings, Daley, Hawthorne, and Mullen knowingly or recklessly approved of the dissemination of incorrect or misleading statements related to the Company's earnings guidance and financial and disclosure controls.  Defendants Billings, Daley, Hawthorne, and Mullen also utterly failed to ensure the effectiveness of the Company's disclosure controls and procedures.  Accordingly, defendants Billings, Daley, Hawthorne, and Mullen breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants

Billings, Daley, Hawthorne, and Mullen face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

95.     Moreover, despite having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Avid for any of the wrongdoing alleged by plaintiff herein.

96.     Plaintiff has not made any demand on the other shareholders of Avid to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Avid is a publicly held company with over 38.9 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Individual Defendants owed and owe Avid fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Avid the highest obligation of good faith, fair dealing, loyalty, and due care.

99.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants

violated their duty of good faith by creating a culture of lawlessness within Avid, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

100.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.    The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company had woefully inadequate internal controls; (ii) the Company's financial statements were not prepared in accordance with GAAP or Avid's publicly stated accounting policies; and (iii) the Company's public statements concerning is financial prospects and internal controls were incorrect and misleading.    Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

101.    Director Defendants Hernandez, Billings, Hawthorne, Daley, Moon, Park, Mullen, and Bakish, as directors of the Company, owed Avid the highest duty of loyalty.    These defendants breached their duty of loyalty by issuing or recklessly permitting the Company to issue improper statements.    Defendants Hernandez, Billings, Hawthorne, Daley, Moon, Park, Mullen, and Bakish knew or were reckless in not knowing that: (i) the Company had woefully inadequate internal controls; (ii) the Company's financial statements were not prepared in accordance with GAAP or Avid's publicly stated accounting policies; and (iii) the Company's public statements concerning is financial prospects and internal controls were incorrect and misleading.    Accordingly, defendants Hernandez, Billings, Hawthorne, Daley, Moon, Park, Mullen, and Bakish breached their duty of loyalty to the Company.

102.    The Audit Committee Defendants, defendants Billings, Daley, Hawthorne, and Mullen, breached their fiduciary duty of loyalty by approving the statements described herein

which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Billings, Daley, Hawthorne, and Mullen failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time. Defendants Billings, Daley, Hawthorne, and Mullen also utterly failed to ensure the adequacy of the Company's disclosure controls and procedures, as required by the Audit Committee Charter in effect at the time. Accordingly, defendants Billings, Daley, Hawthorne, and Mullen breached their duty of loyalty to the Company.

103.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Avid has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

104.     Plaintiff, on behalf of Avid, has no adequate remedy at law.

### COUNT II

**Against the Individual Defendants for Waste of Corporate Assets**

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.     As a result of the decision to cause or allow the Company operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Avid to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

107.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

108.    Plaintiff, on behalf of Avid, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Avid.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Avid.

111.    Plaintiff, as a shareholder and representative of Avid, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

112.    Plaintiff, on behalf of Avid, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Avid, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Avid to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Avid and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

  1. a proposal to appropriately test and then strengthen the Company's internal control functions and disclosure oversight policies and procedures;

  2. a proposal to appropriately test and then strengthen the Company's revenue recognition policies and procedures;

  3. a proposal to ensure the appointment of adequately qualified internal accounting department;

  4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

  5. a provision to permit the shareholders of Avid to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Avid has an effective remedy;

D. Awarding to Avid restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 26, 2013

PARTRIDGE, ANKNER & HORSTMANN,
LLP
TERENCE K. ANKNER

/S/ TERENCE K. ANKNER

_____
TERENCE K. ANKNER

BBO No. 552469
The Berkeley Building
200 Berkeley Street, 16th Floor
Boston, MA 02116
Telephone: (617) 859-9999
Facsimile: (617) 859-9998
tka@anknerlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
ASHLEY R. PALMER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
apalmer@robbinsarroyo.com

Attorneys for Plaintiff

875965